Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| PETER P., individually and on behalf of B.P., a minor,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED HEALTHCARE INSURANCE COMPANY OF ILLINOIS, UNITED BEHAVIORAL HEALTH/OPTUM, and the STAT ANESTHESIA SPECIALISTS, LTD MEDICAL BENEFIT PLAN,<br><br>Defendants. | COMPLAINT<br><br>Civil No. 4:21-cv-00093-DN |

Plaintiff Peter P. ("Peter"), individually and on behalf of B.P., a minor, through his undersigned counsel, complains and alleges against Defendants United HealthCare Insurance Company of Illinois and United Behavioral Health/OPTUM (collectively "UBH") and the Stat Anesthesia Specialists, LTD Medical Benefit Plan ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Peter P. ("Peter") and B.P. ("B.") are natural persons residing in Will County, Illinois. Peter is B.'s father.

2. United HealthCare Insurance Company is an insurance company doing business in Utah and throughout the United States and was the claims administrator as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case.

3. United Behavioral Health/OPTUM is an affiliate company specializing in mental health claims and handled the processing of the claims at issue in this case and was the entity responsible for the appeals process in this case.

4. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Peter was a participant in the Plan and B. was a beneficiary of the Plan at all relevant times.

5. B. received medical care and treatment at Turn About Ranch, Inc. ("TAR") from August 8, 2018 to November 30, 2018. TAR is a licensed residential treatment facility located in Utah, which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

6. United HealthCare Insurance Company, acting in its own capacity or through its subsidiary and affiliate ("UBH") (or under the brand name Optum), denied claims for payment of B.'s medical expenses in connection with her treatment at TAR. This lawsuit is brought to obtain the Court's order requiring the Plan to reimburse Peter for the medical expenses he has incurred and paid for B's treatment.

7. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

8. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because UBH does business in Utah and the treatment at issue took place in Utah. In addition, venue in Utah

will save the Plaintiffs costs in litigating this case. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

9. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### B.'s Developmental History and Medical Background

10. B. was strong willed and aggressive from early childhood. She began exhibiting violent behaviors at a young age and had difficulty keeping friends. Her assaults on her brother prompted Peter and his wife to seek therapy for her when she was eight years old. She was also physically aggressive to her parents.

11. When B. was ten years old, she was moved to a private Catholic school in hopes that more rigid rules and expectations would rein in some of her aggressive tendencies. They also sought help from a new therapist and although B. received therapy for two more years, there was little progress.

12. Peter and his wife continued to struggle with B.'s defiance. B. also began showing symptoms of depression. She lacked empathy and would laugh at inappropriate events. She was drinking alcohol and engaging in unsafe sexual activity.

13. The family again sought a new therapist and B. was diagnosed with Borderline Personality Disorder with histrionic traits, Major Depressive Disorder, and Persistent Depressive Disorder with anxious distress.

14. B.'s condition continued to deteriorate and she was isolated, extremely anxious, and was engaging in self-harm. Psychiatric medications were prescribed but B. was constantly nauseated and irritable when taking the medications and did not appear to be getting any benefit from taking them.

15. In February of 2018, B. was admitted to the hospital with suicidal ideation.

16. B.'s therapist recommended residential treatment as he believed her to be a danger to herself and others.

17. B. was admitted to TAR on August 8, 2018.

18. A psychiatric assessment was completed prior to B.'s admission and residential treatment was determined to be appropriate for her based on:

    Severe Individual Intra-psychic Disorder (mental, emotional and behavioral)
    Serious Developmental Disturbances
    Significant Disturbances in Environmental Relationships

19. A Master Treatment Plan was created for B.'s stay at TAR which identified areas of concern and proposed specific treatment strategies for addressing each area.

20. B. worked very hard during her treatment at TAR and although her progress was slow, she made steady gains in managing her moods, taking responsibility, and developing coping skills.

## The Appeal

21. Claims were submitted to UBH for coverage and payment of B.'s treatment at TAR.

22. On August 28, 2018, UBH wrote to TAR and denied coverage for B.'s treatment on the basis that "[t]he facility does not meet service expectations of your benefit plan," and asserted that B.'s conditions did not meet the UBH Level of Care Guidelines for the Mental Health Residential Center Level of Care ("Guidelines").

23. Peter appealed the denial in a letter dated January 30, 2019. First, Peter outlined the requirements of ERISA in connection with the appeal process. Among other things, ERISA and its regulations require that all information submitted by a claimant be taken into consideration in evaluating an appeal. Peter argued that in order to understand B.'s conditions and the necessity of her treatment at TAR, it was critical that UBH include *all* of the information he provided with his appeal.

24. Second, Peter discussed the requirements of MHPAEA. He noted that TAR was both a licensed residential treatment facility in the State of Utah and is a CARF certified treatment program. He referred to the definition of residential treatment found in his Plan and argued that TAR clearly met the definition.

25. Peter argued that UBH was imposing limitations on claims for coverage for treatment of mental health conditions that were more restrictive than those for other types of intermediate care, a violation of MHPAEA.

26. Peter then proceeded to discuss B.'s developmental background, the many instances of failed treatment at lower levels of care, and the recommendation of B.'s treating therapist, a psychologist, for residential treatment.

27. Peter cited to therapy notes from B.'s treatment at TAR which demonstrate the medical necessity of her admission at TAR and her ongoing need for residential treatment during her stay at TAR.

28. Finally, Peter compared the Guidelines with the coverage provisions found in his Plan and stated that where discrepancies existed between the two, the terms of the Plan should control.

29. Peter requested that in the event UBH determined its initial denial had been correct, that he be provided with *specific* information about UBH's decision-making process. He also asked for copies of the administrative services agreement between UBH and his Plan, any clinical guidelines relied on by UBH, guidelines for other types of intermediate care covered by the Plan, and any reports by clinicians who had reviewed the claim.

30. On March 7, 2019, UBH maintained it denial of coverage based on its assertion that B. did not meet the Guidelines for residential treatment and could have been treated at a lower level of care. UBH claimed that B. was capable of learning and using coping skills, was not engaging in self-harm, was not feeling like harming herself or others, and was participating in her therapeutic program, she was not eligible for coverage.

31. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

32. The denial of benefits for B.'s treatment was a breach of contract and caused Peter to incur medical expenses that should have been paid by the Plan in an amount totaling over $70,000.

33. UBH failed to provide the materials Peter had requested, including the medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities.

///

///

# FIRST CAUSE OF ACTION

## (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

34. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a standard of care upon plan fiduciaries such as United, acting as agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. § 1104(a)(1).

35. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

36. The denial letters produced by UBH do little to elucidate whether UBH conducted a meaningful analysis of Peter's appeal or whether it provided him with the "full and fair review" to which he is entitled. UBH failed to substantively respond to the issues presented in Peter's appeal and did not meaningfully address the arguments or concerns that he raised during the appeal process.

37. UBH, as the agent of the Plan, breached its fiduciary duties to Peter and B. when it failed to comply with its obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in the Plaintiffs' interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of Plaintiffs' claims.

38. The actions of UBH, as agent for the Plan, in failing to provide coverage for B.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

39. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of United's fiduciary duties.

40. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

41. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

42. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R.

43. UBH's medical necessity criteria for intermediate level mental health treatment benefits are more stringent or restrictive than the medical necessity criteria the Plan applies to intermediate level medical or surgical benefits.

44. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for B.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

45. For none of these types of treatment does the Plan exclude or restrict coverage of medical/surgical conditions based on medical necessity, geographic location, facility type, provider specialty, or other criteria in the manner UBH excluded coverage of treatment for B. at TAR.

46. Specifically, in its review of B.'s claims, UBH's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that B. received.

47. UBH's improper use of acute inpatient medical necessity criteria is revealed in the statements in UBH's final denial letter such as saying that because B. was not a danger to herself or others, she did not meet the Guidelines for residential treatment.

48. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that B. received.

49. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

50. As another example of the Plan's improper application of its criteria to evaluate the treatment B. received, UBH relied on assertions such as B. was participating in her therapeutic treatment as a justification to deny treatment. In fact, B.'s engagement in the program serves as an indicator rather than a contra-indicator of the medical necessity of treatment in a non-acute residential setting.

51. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

52. The actions of UBH, as agent for the Plan, requiring conditions for coverage that do not align with medically necessary standards of care for treatment of mental health and substance use disorders and in requiring something above and beyond the licensing requirements for state law violate MHPAEA because the Plan does not impose similar restrictions and coverage limitations on analogous levels of care for treatment of medical and surgical conditions.

53. When the Plan or its agent receive claims for intermediate level treatment of medical and surgical conditions, the Plan provides benefits and pays the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice. UBH, as agent for the Plan, evaluated B.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice.

54. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

55. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by UBH, as written or in operation, use processes, strategies, evidentiary standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, evidentiary standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

56. UBH and the Plan did not produce the documents Peter requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity Peter's allegations that UBH and the Plan were not in compliance with MHPAEA.

57. The violations of MHPAEA by UBH and the Plan are breaches of fiduciary duty and also give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

    (a) A declaration that the actions of the Defendants violate MHPAEA;

    (b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

    (c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

    (d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

    (e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

    (f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

    (g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

    (h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

58. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for B.'s medically necessary treatment at TAR under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 30th day of August, 2021.

By     s/ Brian S. King
        Brian S. King
        Attorney for Plaintiffs

County of Plaintiffs' Residence:
Will County, Illinois